**ATKINS v. BENDER, Collector of Internal Revenue.**

District Court, W. D. Louisiana, Shreveport Division. February 15, 1928.

On Rehearing, June 6, 1928.

No. 1618.

1. **Internal revenue ⟲25—Assessment of tax, made within period as extended by agreement of taxpayer and Commissioner, held not barred by limitations (Revenue Act 1924, §§ 277 (a), par. 2, 278 (c), (d); 26 USCA §§ 1057 (a2), 1060, 1061).**

Where taxpayer executed return on March 13, 1920, under Revenue Act 1924, § 277 (a), par. 2 (26 USCA § 1057 (a2); Comp. St. § 6336⅛zz(4), (a2), period for assessing tax did not expire until five years later (March 13, 1925); and where Commissioner and taxpayer entered into agreement extending period for making assessment for one year, *held* that, under Revenue Law 1924, § 278 (c), (d), 26 USCA §§ 1060, 1061, Comp. St. § 6336⅛zz (5c), (5d), assessment made on March 10, 1926, on which taxes were paid on May 11, 1926, was not barred by limitations.

2. **Internal revenue ⟲7(11), 9(27)—Bonds of oil company, received by owner of one-half interest in mineral lease for such interest, held subject to income and profit taxes; "Exchange of securities" (Revenue Act 1918, § 202 (b); Comp. St. § 6336⅛bb (b).**

Bonds received by owner of undivided one-half interest in mineral lease from oil company, in return for such interest, *held* subject to income and profit taxes, it not having been an "exchange of securities," within Revenue Act 1918, § 202 (b), Comp. St. § 6336⅛bb (b), but a sale or assignment.

**3. Internal revenue ⊜25—Bonds paid to holder of patented oil-refining process held subject to income and profit taxes at market value.**

Bonds of oil company, paid to holder of patent process for refining oil for such process, *held* subject to income and profit taxes at their market value, from which no deductions can be allowed; there being no sufficient proof to show what was paid for such process.

**4. Internal revenue ⊜25—Market value of bonds will be treated as cash value, for purpose of income tax (Revenue Act 1918, § 202; Comp. St. § 6336⅛bb).**

Under Revenue Act 1918, § 202 (Comp. St. § 6336⅛bb), market value of oil company bonds, paid for mineral lease and patented oil-refining process, will be treated as cash value for purpose of income tax, though they were not payable for 10 years.

**5. Internal revenue ⊜7(22)—Owner of oil lease is entitled to allowance of depreciation in determining income tax, without segregating that applicable to lease from that applicable to equipment.**

Owner of oil and gas lease is entitled to deductions for depreciation in returning amount of income tax, and it was unnecessary to segregate the depreciation applicable to the lease from that applicable to equipment, since, as oil was drawn from land, the lease, which was valuable only for that purpose, suffered depreciation, as did equipment used for its operation.

At Law. Action by Mrs. Alma Foster Atkins against J. O. Bender, Collector of Internal Revenue. Judgment for plaintiff in accordance with opinion.

See, also, 18 F.(2d) 357.

Wilkinson, Lewis & Wilkinson, of Shreveport, La., for plaintiff.

Philip H. Mecom, U. S. Atty., of Shreveport, La.

DAWKINS, District Judge. This is an action at law to recover from the government the sum of $104,306.59, paid under protest as income and profit taxes for the year 1919. The claim is based, first, upon the contention that the right to collect the taxes, if it ever existed, had been lost by the running of limitations before proceedings were instituted for that purpose; and, secondly, upon the proposition that petitioner did not owe the taxes. The jury has been waived in writing and the matter submitted to the court.

## The Facts.

The Caddo Oil & Refining Company was a Louisiana corporation, organized December 9, 1916, with an authorized capital of $10,000,000, of the par value of $100 per share. It acquired certain properties in this state, including a refinery, pipe lines, lands, leases, etc., and issued therefor 99,994 shares, of the total capital of $10,000,000. This stock had a market value of $20 per share. It was not issued direct to the subscribers, but in the name of three individuals, designated as voting trustees, who gave to the stockholders trust receipts in proportion to the stock belonging to each, respectively.

Early in the year 1919 the said Caddo Oil & Refining Company (hereinafter referred to as the Louisiana Company) found itself in need of additional property and funds. It had outstanding first mortgage 6 per cent. bonds, aggregating $2,122,000. A proposition to issue additional stock was considered, but discarded. Negotiations were then opened with certain financial interests in New York and Philadelphia, and on May 2, 1919, there was organized a New York corporation, styled the Caddo Central Oil & Refining Company (hereinafter referred to as the New York Company), with an authorized capital of $15,000,000 consisting of 150,000 shares, also of the par value of $100 each. The incorporators were Thos. F. Thornton, Mortimer Neuman, and Morris Buchter, who each subscribed for 2 shares. Thereupon one Jos. S. Qualey made a proposition to the said New York Company, which was duly accepted, as follows: .

"New York, May 2, 1919.

"To the Board of Directors, of Caddo Central Oil & Refining Corporation—Gentlemen: I understand that your company has been organized under the laws of the state of New York, having an authorized capitalization of $15,000,000, divided into 150,000 shares, all common stock, of the par value of $100 per share, for the purpose, among other things, of engaging in the business of producing and refining oil.

"The Caddo Oil & Refining Company of Louisiana, Inc., is a corporation organized under the laws of the state of Louisiana, owning properties which are generally described by the vice president of said company as follows:

"Over 30,000 acres of oil-producing lands in fee, located in the Caddo fields of North Louisiana, and 7,500 acres of similar lands under leaseholds.

"On these properties are 84 producing wells, with a daily production of 2,000 barrels of oil per day, about equally divided between high gravity oil, which produces gasoline, and heavier oil, known as lubricating oil.

"A refinery at Cedar Grove, Louisiana, with a present capacity of 60,000 barrels of oil per month, which at the present time is

showing an average profit of $1.078 per barrel.

"A three-fourths interest in a refinery at Shreveport, Louisiana, with a monthly capacity of 15,000 barrels.

"A recently completed casinghead gasoline plant located near Mooringsport, Louisiana, making about 25 barrels of high grade gasoline per day from casinghead gas.

"Modern steel storage tanks with a capacity of over 200,000 barrels of oil, which are located at advantageous points on the properties.

"83 miles of pipe line and numerous gathering lines which tap the entire North Louisiana field, connected with pumping stations which supply oil to the various storage tanks and refineries owned by the company.

"The entire property is connected by a telephone system, with switchboard in the company's main office, and there are warehouses, cottages, boarding houses for employees, stables for live stock, and trucks, automobiles, drilling rigs, and similar paraphernalia pertaining to a modern oil property.

"144 steel tank cars owned outright, and 36 under lease, having a capacity of from 8,000 to 10,000 gallons per car.

"I understand you have caused these properties to be appraised by William Gross, Esq., and the present financial condition of the company is indicated by the balance sheet and earnings statement audited by Messrs. Price, Waterhouse & Co. and transmitted herewith.

"I hereby offer to sell, assign, transfer, and set over, or cause to be sold, assigned, transferred, and set over, to your company, by due and proper deed of conveyance, bill of sale, or other requisite legal documents to be approved by counsel for your company, all the properties of the Caddo Oil & Refining Company of Louisiana, Inc., and all of its assets of every name, nature, and description whatsoever, tangible and intangible, as a going concern, or, in lieu thereof, to transfer and deliver, or cause to be transferred and delivered, to your company the whole of the issued and outstanding capital stock of the Caddo Oil & Refining Company of Louisiana, Inc., consisting of 100,000 shares, of the par value of $100 each. The said properties are free from any lien or incumbrance of any kind, except $2,122,000, face value first mortgage ten-year sinking fund 6 per cent. gold bonds, of an authorized issue of $10,000,000 (the said mortgage being closed in the aforesaid sum of $2,122,000) and the indebtedness shown upon the audit of Messrs. Price, Waterhouse & Co.

"There has been released from the lien of the last-described mortgage land near Lewis, Louisiana, on which your company can build a new refinery with the funds to be supplied by me as hereinafter stated.

"I also agree to transfer or cause to be transferred to your company the additional Louisiana oil lands or leaseholds described in the annexed schedule, and to pay or cause to be paid into the treasury of your company the sum of $2,499,400 in cash.

"In exchange for all the foregoing, I agree to accept from your company 149,994 shares of the common capital stock thereof, of the par value of $100 per share, and $4,378,000 face value (of a total authorized issue of $5,378,000) first mortgage consolidated ten-year sinking fund 6 per cent. gold bonds, to be secured by a mortgage constituting a junior lien to the $2,122,000 closed mortgage hereinbefore described on the properties which are now subject to said mortgage, and to constitute a first lien upon the property near Lewis, Louisiana, hereinbefore described, and the refinery to be built thereon by your company, and as well upon the new properties turned over by me to your company, as herein set forth, and upon any and all of its other property not acquired by it from Caddo Oil & Refining Company of Louisiana, Inc., the remaining $1,000,000 of first consolidated mortgage bonds last described out of the total authorized issue of $5,378,000, to remain in the treasury of your company for corporate purposes; the terms and conditions of the mortgage securing the said bond issue and the form of said mortgage and bonds to be as per the draft herewith submitted.

"The said bonds and certificates of stock are to be delivered to me or to my nominees, all, however, upon the following express conditions:

"(a) That with and out of the $2,499,400 cash to be supplied by me to the treasury of your company your company agree forthwith to proceed with the erection and construction upon the land near Lewis, Louisiana, released from the lien of the mortgage made by Caddo Oil & Refining Company of Louisiana, Inc., of a modern refinery of 5,000 barrels per day capacity, to cost not exceeding $1,750,000; and

"(b) The assumption by your company and its agreement to pay all of the existing indebtedness of Caddo Oil & Refining Company of Louisiana, Inc., as disclosed by the audit of Messrs. Price, Waterhouse & Co.; and

"(c) These properties having been examined and approved for your account and

the books of Caddo Oil & Refining Company of Louisiana, Inc., having been audited for your benefit, this offer in its entirety is without recourse of any kind to me.

"If this proposition is acceptable to you, will you kindly take due and appropriate corporate action to accept the same, to authorize the making of the mortgage and the issuance of the bonds therein described to me or my nominees, and the issuance of the capital stock of your company, as herein provided, to me or my nominees, and notify me of such corporate action in due form by having your company, through its authorized officers, pursuant to resolutions adopted for that purpose, sign the duplicate original of this offer beneath the words 'approved and accepted,' and return the same so signed by you to me; and this letter and the duplicate original thereof, so signed by you, shall constitute the contract between us.

"Very truly yours,

"[Signed] Joseph S. Qualey.

"Approved and accepted:

"Caddo Central Oil & Refining Corporation,

"By Thomas F. Thornton, Secretary."

Thereafter, pursuant to said agreement, all of the property of the Louisiana Company was conveyed to the New York Company and all of the outstanding stock was likewise transferred to it or its agents. A few of the old stockholders in the Louisiana Company became holders of stock in the new company, but in the main they received bonds for their stock on the basis of $35 per share, face value.

Plaintiff in this case, and her husband, J. B. Atkins, lived under the régime of the community of acquêts and gains of the Louisiana law, which made them equal owners of all property and funds earned and acquired during the marriage (although the husband, as head and master of the marital community, had the control and right of disposal thereof while it lasted). J. B. Atkins held trustees' receipts for 7,960 shares of the Louisiana Company's stock, 132 shares of which belonged to other persons, and similar receipts for 500 shares stood in the name of the plaintiff. He was also the owner of an undivided one-half interest in what was known as the Noel mineral lease and the holder of a patent process for refining oil, upon which he received a royalty from the Louisiana Company. As a condition precedent to the acquisition of his stock and that of his wife, he was required to convey also to the new company both of these interests. The New York Company agreed to deliver for all the stock

in the Louisiana Company, on the basis of $35 worth of bonds for each share of stock, 6 per cent. gold bonds, maturing in 10 years and secured by mortgage upon all property acquired by it in the transaction (both that conveyed by the Louisiana Company and otherwise acquired), subject only to the $2,122,000 of first mortgage bonds outstanding against the property owned and conveyed by the Louisiana Company. Under this arrangement there was delivered to Atkins and his wife the following:

For the undivided one-half interest in the Noel lease, $85,000 in cash and bonds of $100,000 face value; for his 7,828 shares of stock similar bonds to the face value of $273,980; for the 500 shares of the wife (plaintiff) $17,500 face value of said bonds; and for the process of refining oil known as the Christman process, $200,000 of said bonds, or a total of $591,480 of bonds, plus the $85,000 in cash, aggregating in all $676,480. The bonds were worth on the market at the time $64.43 each, and hence the total cash value of what was received amounted to $435,856.06. (The Board of Tax Appeals, in passing upon the case of the husband, found that Atkins and his wife were allowed less in bonds per share for their stock in the Louisiana Company than the other stockholders, probably $15 per share, instead of $35, but in view of the admission of counsel for the government in its brief, hereinafter referred to, that the bonds received for the stock were not subject to taxation, in line with the ruling of the Board of Tax Appeals when considering the case of the husband, it becomes unimportant to determine the correctness of this contention.)

## Limitations.

[1] Plaintiff made her return covering her half of the community rights, and which is the basis of the assessment in this case, on December 7, 1920, and there was filed with the Commissioner on December 24, 1924, a document styled "Income and Profits Tax Waiver," reading as follows:

"In pursuance of the provisions of existing Internal Revenue Laws, Mrs. J. B. Atkins, a taxpayer, of Shreveport, Louisiana, and the Commissioner of Internal Revenue, hereby consent to extend the period prescribed by law for a determination, assessment, and collection of the amount of income, excess profits, or war profits taxes due under any return made by or on behalf of said taxpayer for the year 1919, under the Revenue Act of 1924, or under prior income, excess profits, or war profits tax acts, or under sec-

tion 38 of the act entitled 'An act to provide revenue, equalize duties, and encourage the industries of the United States, and for other purposes,' approved August 5, 1909. This waiver is in effect from the date it is signed by the taxpayer and will remain in effect for a period of one year after the expiration of the statutory period of limitation within which assessments of taxes may be made for the year or years mentioned, or the statutory period of limitation as extended by section 277 (b) of the Revenue Act of 1924, or by any waivers on file with the Bureau.

"[Signed] Mrs. J. B. Atkins, Taxpayer.
                "D. H. Blair, Commissioner."

On March 10, 1926, the Commissioner assessed the deficiency tax and the same was paid, with interest, under protest, by a check dated "5/11/1926." Section 277 (a), paragraph 2, of the Revenue Act of 1924 (26 USCA § 1057(a2); Comp. St. § 6336⅛zz (4), (a2), reads as follows:

"(2) The amount of income, excess profits, and war profits, taxes imposed by the act entitled 'An act to provide revenue, equalize duties, and encourage the industries of the United States, and for other purposes,' approved August 5, 1909, the act entitled 'An act to reduce tariff duties and to provide revenue for the government, and for other purposes,' approved October 3, 1913, The Revenue Act of 1916, the Revenue Act of 1917, the Revenue Act of 1918, and by any such act as amended, shall be assessed within five years after the return was filed, and no proceeding in court for the collection of such taxes shall be begun after the expiration of such period."

Sections 278 (c) and 278 (d) of the same act provide as follows:

"(c) Where both the Commissioner and the taxpayer have consented in writing to the assessment of the tax after the time prescribed in section 277 for its assessment the tax may be assessed at any time prior to the expiration of the period agreed upon." 26 USCA § 1060; Comp. St. § 6336⅛zz (5), (c).

"(d) Where the assessment of the tax is made within the period prescribed in section 277 *or in this section,* such tax may be collected by distraint or by a proceeding in court, begun within six years after the assessment of the tax. Nothing in this act shall be construed as preventing the beginning, without assessment, of a proceeding in court for the collection of the tax at any time before the expiration of the period within which an assessment may be made." 26 USCA § 1061; Comp. St. § 6336⅛zz (5), (d).

It is thus seen that under the act of 1924—section 277 (a), par. 2—the Commissioner had the right to assess the taxes for the preceding years, including 1919, at any time "within five years after the return was filed." He was also authorized to make an agreement with the taxpayer—section 278 (c)—to extend the period for making the assessment, and where it was made within the time provided by section 277, "or in this section"—section 278 (d)—he was entitled to collect the taxes "within six years after the assessment. * * * *"

Inasmuch as the return of the plaintiff was executed on December 7, 1920, and presumably filed thereafter, the period for assessing under the statute did not expire until five years later (December 7, 1926), and since the agreement extended the right to assess for one year the Commissioner could do so at any time before December 7, 1926. As appears hereinabove, the assessment was actually made on March 10, 1926, and the taxes paid on May 11, 1926, both before the expiration of the time as extended. In these circumstances, I see no basis for the application of the statute of limitations.

### On the Merits.

With respect to the taxes assessed upon the bonds received for the stock of the Louisiana Company, the brief for the government states that "the bonds received by Atkins in exchange for his stock in the old company were, under section 202 (b) of the Revenue Act of 1918 (Comp. St. § 6336⅛bb (b), an exchange on reorganization, and therefore no gain or loss would be deemed to occur on them."

It being conceded that there was nothing due as income upon the bonds received for the stock in the Louisiana corporation, this leaves for consideration the correctness of the assessment and collection of the taxes upon the bonds and cash received for the Noel lease and the Christman process. It is, of course, not disputed that, if there was a profit, taxes were due upon the $85,000 received in cash for the Noel lease.

[2] I agree with the finding of the Board of Tax Appeals that, as to the sale of the one-half interest in the Noel lease and the Christman process, the same cannot be treated on the same basis with the transfer of the stock of the Louisiana Company. They were separate property of a different kind, having no connection with the corporation, except that the lease was jointly owned by it with Atkins, while the Christman process was used by it and a royalty paid him therefor. In fact,

they were treated and valued separately throughout the negotiations and closing of the transaction hereinbefore mentioned. It was in no sense an exchange of securities under the statute, but clearly a sale or assignment, upon which, if there was a profit, the taxes were due. The price of the Noel lease was $85,000 cash and bonds of the face value of $100,000, which bonds had an actual market value of $64.43 cash, or a total of $64,-430. This made the lease bring $149,430, against which the taxpayer was entitled to credit or deduct $74,828.95, as cost and depreciation, leaving subject to the taxes the sum of $74,541.05, as against the Noel lease. I think this finding by the board as to deductions to be allowed just and reasonable, although, of course, this proceeding is in no sense a review of the action before the board.

[3] There is no sufficient proof in the record to show what was paid for the rights to the Christman patented process; hence no deductions can be allowed against the sum received for it from the New York Company. The latter gave for this item $200,000 of similar bonds, which, at the market value of $64.43, amounted to $128,860, which in my opinion was also subject to taxation.

[4] Plaintiff further contends that she should not pay an income tax upon the market value of bonds received by her from the New York Company, because they were not payable for 10 years, and the books of her husband were kept on a cash and disbursement basis, according to section 8 (g) of the Act of 1916 (Comp. St. § 6336h(g). However, section 202 of the Revenue Act of 1918 (Comp. St. § 6336⅛bb), it would seem, was intended to meet such a situation as this, for it provides: "When property is exchanged for other property, the property received in exchange shall, for the purpose of determining gain or loss, be treated as the equivalent of cash to the amount of its fair market value, if any."

It is not disputed that these bonds did have a fair market value of $64.43, and hence under this law I think they must be treated as the equivalent of cash income and taxed as such.

## Atkins-Cooney Lease.

[5] With respect to the claim for depreciation of the Atkins-Cooney lease, the Board of Tax Appeals declined to allow anything therefor, because there was insufficient evidence to distinguish the cost of the lease from that of the equipment. I think this was due to a failure to understand that the depreciation was applicable to the lease and equipment as an entirety. As the oil was drawn from the land, the lease, which was valuable only for that purpose, certainly suffered a depreciation, as did the equipment used for its operation, so that I think it was unnecessary to segregate the two values. It would seem that the amount claimed was not unreasonable. Any one familiar with the oil-producing business knows that the value of oil properties depreciates very rapidly, and not many of them pay very substantially after five years. In any event, the income from the lease is always subject to taxation, provided it is sufficient to bear a tax. In my opinion, the deduction of $1,836.86 claimed on this score should be allowed.

There should be judgment for the plaintiff in accordance with the views expressed herein. Proper notation will be made upon the requested findings of fact and rulings of law. A decree may be presented.

## On Rehearing.

In the application for rehearing attention of the court was called to the fact that the defendant was not making the contention that prescription ran from the 20th day of December, 1920, when the return of this taxpayer was filed, it being conceded by the government that the tolling of limitations started with the filing of the return by the husband, J. B. Atkins, on March 13, 1920. Upon further examination of the record, it appears that this view is correct; hence what was said in the former opinion, filed February 16, 1928, to the effect that both the additional assessment and the collection of the taxes were made within the period as extended by agreement, is inapplicable.

However, it does appear from the record that the additional assessment was made on March 10, 1926, within the extension of the year agreed upon (March 13, 1925, when the right to assess would have otherwise expired March 13, 1926), and, since this is true, it seems to me that the government thereafter had the right to collect the taxes at any time within a period of six years by the express provisions of section 278 (paragraphs (c) and (d) of the Revenue Act of 1924, which is quoted in the former opinion above referred to). Paragraph (c) of this section provides that, where the Commissioner and the taxpayer have agreed in writing to an assessment after the expiration of the time provided in section 277, the same may be done "at any time prior to the expiration of the period agreed upon," and, "where the assessment of the tax is made within the period prescribed in section 277 [act of 1924] or in this section [278], such

tax may be collected by distraint or by a proceeding in court, begun within six years after the assessment of the tax."

It may be noted that the agreement in this case was made after the passage of the act of 1924 of that year. My opinion is, therefore, that it can make no difference that the "original" return was filed on March 13, 1920, since the assessment was made on March 10, 1926, before the year of extension had expired. This makes the plea of prescription unavailing. See U. S. v. Russell (C. C. A.) 22 F.(2d) 249, cited in Florsheim Bros. Dry Goods Co. v. U. S., 26 F. (2d) 505, by this court.

The judgment heretofore rendered in this case is therefore reinstated. Specific rulings upon requested findings of fact and conclusions of law have been indicated thereon.